UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>                              Plaintiff,<br><br>        v.<br><br>BRAYTON POINT LLC, PATRIOT STEVEDORING & LOGISTICS, LLC, and EASTERN METAL RECYCLING-TERMINAL, LLC,<br><br>                              Defendants. | COMPLAINT Case No.<br><br>1:23-cv-10819 |

## INTRODUCTION

1.      Brayton Point LLC ("Brayton Point") owns an approximately 234-acre industrial business area in Somerset, Massachusetts on Brayton Point Road, along Mount Hope Bay (the "Brayton Point Industrial Property"). The Brayton Point Industrial Property is located on a peninsula on Mount Hope Bay within 500 yards of a residential community. Patriot Stevedoring & Logistics, LLC ("Patriot") is the marine terminal operator at the Brayton Point Property. Between August 2019 and March 21, 2022, Eastern Metal Recycling-Terminal, LLC ("EMR") conducted a scrap metal storage and loading operation on a portion of the Brayton Point Property. The scrap metal operation ceased operating on March 21, 2022. The location of the scrap metal storage and loading operation is referred to herein as the "Facility" and is depicted on Exhibit 1.

2.      Since August 2019, Defendants have violated the Federal Clean Water Act, 33 U.S.C. §§ 1251-1387, by discharging polluted industrial stormwater from the Facility into Mount Hope Bay without complying with an industrial stormwater permit issued by the United States Environmental Protection Agency ("EPA").

3.      Between August 2019 and March 21, 2022, and on a regular basis, Defendants emitted visible plumes of dust and excessive noise from the Facility, disturbing the peace and comfort of neighbors in the surrounding community, causing them in some cases to lose sleep, change plans, stay indoors, and/or close their windows.

4.      The dust traveled to the surrounding environment, including to a residential community of Somerset to the north of the Facility ("Brayton Point Residential Neighborhood"), in violation of the Federal Clean Air Act, 42 U.S.C. §§ 7401-7675, and the Massachusetts Air Act. G.L. c. 111, §§ 142A-142O. Dust from the Facility constituted particulate matter ("PM") and likely contained heavy metals. Defendants' dust emissions posed health risks to exposed individuals, particularly those among at-risk populations, such as children.

5.      The noise traveled to the surrounding environment, including into the Brayton Point Residential Neighborhood, in violation of the Massachusetts Air Act.

6.      The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Federal Clean Water Act, the Federal Clean Air Act, and the Massachusetts Air Act. The Commonwealth seeks injunctive relief for Defendants' Clean Water Act violations, civil penalties for the state and federal clean air act violations, and other relief the Court deems appropriate to redress Defendants' illegal actions, including their unlawful emissions and discharges of pollution.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Federal Clean Water Act, 33 U.S.C. § 1365(a)(1)(A), Section 304(a) of the Federal Clean Air Act, 42 U.S.C. § 7604(a), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

8.     On May 11, 2021, plaintiff provided notice of Defendants' violations of the Federal Clean Water Act and the Federal Clean Air Act, and of its intention to file suit against Defendants (the "Notice Letter"), to the Administrator of EPA; the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Defendants, as required by Section 505(b)(1)(A) of the Federal Clean Water Act, 33 U.S.C. § 1365(b)(1)(A) and Section 304(b)(1)(A) of the Federal Clean Air Act, 42 U.S.C. § 7604(b)(1)(A). On August 25, 2021, plaintiff mailed a copy of the Notice Letter to the Governor of Massachusetts.

9.     More than sixty days have passed since notice was served.

10.    This action is not barred by any prior state or federal action to enforce the violations alleged in this complaint.

11.    The Commonwealth has an interest in protecting for its residents the integrity of the Massachusetts environment, and the related health, safety, economic, recreational, aesthetic, and environmental interest that the environment provides. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Defendants' failure to comply with environmental laws, as alleged herein. The relief sought herein will redress the harms to the

Commonwealth caused by Defendants' activities. The acts and omissions alleged will irreparably

harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

12.     Venue is proper in the District Court of Massachusetts pursuant to Section

505(c)(1) of the Federal Clean Water Act, 33 U.S.C. § 1365(c)(1), and Section 304(c)(1) of the

Federal Clean Air Act, 42 U.S.C. § 7604(c)(1), because the source of the violations is located

within this judicial district.

## PARTIES

13.     Plaintiff is the Commonwealth appearing by and through the Attorney General.

14.     The Attorney General is the chief law officer of the Commonwealth, with offices at

One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the

relief requested herein, under G.L. c. 12, §§ 3 and 11D.

15.     Defendant Brayton Point LLC is a foreign limited liability company incorporated in

Missouri. Brayton Point LLC owns the site of the scrap metal facility and water transportation

facility that was operated by Eastern Metal Recycling-Terminal, LLC and Patriot Stevedoring &

Logistics, LLC between August 2019 and March 21, 2022.

16.     Defendant Eastern Metal Recyling-Terminal, LLC is a Delaware limited liability

company headquartered in New Jersey. EMR operated a scrap metal facility in Somerset,

Massachusetts from August 2019 to March 21, 2022.

17.     Defendant Patriot Stevedoring & Logistics, LLC is a domestic limited liability

company that handles marine terminal loading at the Brayton Point Property in Somerset,

Massachusetts.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

18.     The Federal Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES") program. *See* Sections 301(a), 402(a), and 402(p) of the Federal Clean Water Act; 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

19.     Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, heavy metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

20.     In order to minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 86 Fed. Reg. 10269 (Feb. 19, 2021).[1]

21.     Owners and operators of scrap recycling and water transportation facilities like the Facility are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-4.

---

[1] The February 2021 revision of the Stormwater Permit ("2021 Stormwater Permit") is substantially similar to the 2015 version ("2015 Stormwater Permit"). Where there is a difference in citations due to numbering, this Complaint provides citations to each of the revisions. Where there is no difference in section numbering, this Complaint refers to the two versions jointly as "Stormwater Permit."

22.     The Stormwater Permit requires the Facility to, among other things:

a.  submit a "complete and accurate Notice of Intent" for the Facility that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates (Stormwater Permit Appendix G; 2015 Stormwater Permit section 1.2.1; 2021 Stormwater Permit section 1.3);

b.  prepare a Stormwater Pollution Prevention Plan ("SWPPP") for the Facility that includes, among other things:

1)  an adequate site description that includes the locations of all stormwater outfalls, the locations of all stormwater conveyances, a site map with the boundaries of industrial activity at the Facility, a description of the nature of the industrial activities at the Facility, and the location of potential pollutant sources. (2015 Stormwater Permit section 5.2.3; 2021 Stormwater Permit section 6.2.2);

2)  a description of monitoring procedures including locations where samples are collected, procedures for collection, and parameters for sampling (2015 Stormwater Permit section 5.2.5.3; 2021 Stormwater Permit section 6.2.5.3);

3)  a description of control measures to meet techology-based and water quality-based effluent limitations (2015 Stormwater Permit section 5.2.4; 2021 Stormwater Permit section 6.2.4);

4)  a description of how and why the chosen control measures were selected (2015 Stormwater Permit section 5.2.4; 2021 Stormwater Permit section 6.2.4);

5) a description of the schedule of maintenance and goodhousekeeping measures used to comply with effluent limits (2015 Stormwater Permit section 5.2.5.1; 2021 Stormwater Permit section 6.2.5.1); and

6) an evaluation of unauthorized non-stormwater discharges (2015 Stormwater Permit section 5.2.3.4; 2021 Stormwater Permit section 6.2.3);

c. select, design, install, and implement pollutant control measures that reduce and/or eliminate pollutants to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice (Stormwater Permit section 2);

d. minimize contact of stormwater runoff with industrial materials, including scrap metal materials, and equipment (Stormwater Permit section 8.N.3.1.2);

e. keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with dumpsters, and keeping exposed areas free of waste, garbage and floatable debris (Stormwater Permit section 2.1.2.2);

f. minimize generation of dust and off-site tracking of industrial materials, including scrap metal materials, in order to minimize pollutant discharges (Stormwater Permit section 2.1.2.10);

g. monitor stormwater discharges from all outfalls for compliance with benchmarks applicable to scrap metal recycling and water transportation

facilities (2015 Stormwater Permit sections 6.2.1, 8.N.6, and 8.Q.6; 2021 Stormwater Permit sections 4.2.2, 8.N.7, and 8.Q.7); and

h.  report all benchmark monitoring data to EPA within mandatory deadlines (2021 Stormwater Permit section 7.4; 2021 Stormwater Permit section 7.3).

23.   Discharges of stormwater that are mixed with non-stormwater discharges, other than those mixed with allowable non-stormwater discharges that are listed in the Stormwater Permit, are not eligible for coverage under the Stormwater Permit. 2015 Stormwater Permit section 1.1.4.1; 2021 Stormwater Permit section 1.1.3.1.

24.   Section 505(a)(1) and Section 505(f) of the Federal Clean Water Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).

25.   The Commonwealth is entitled to bring suit under Section 505 of the Federal Clean Water Act, because it is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33 U.S.C. § 1365(g).

26.   Under Section 505 of the Clean Water Act, this Court has authority to enjoin Defendants' violations of the Stormwater Permit, and to impose penalties of up $64,618 per day for each of the company's prior violations. See 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R.  § 19.4; 88 Fed. Reg. 989 (Jan. 6, 2023).

**Federal Clean Air Act Requirements**

27.     The Federal Clean Air Act sets out a comprehensive regulatory scheme designed to prevent and control air pollution. Congress passed the Clean Air Act to prevent air pollution and to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare. Section 101 of the Clean Air Act, 42 U.S.C. § 7401.

28.     EPA has established National Ambient Air Quality Standards ("NAAQS") for a number of "criteria pollutants," such as particulate matter. Section 109 of the Federal Clean Air Act, 42 U.S.C. § 7409; 40 C.F.R. pt. 50. An area that meets the NAAQS for a particular criteria pollutant is deemed to be in "attainment" for that pollutant. Section 107 of the Federal Clean Air Act, 42 U.S.C. § 7407(d)(1). An area that does not meet the NAAQS is a "nonattainment" area. *Id.*

29.     Each state is required to develop a "state implementation plan" ("SIP") to achieve the NAAQS established by EPA. Section 110 of the Federal Clean Air Act, 42 U.S.C. § 7410(a). Specifically, SIPs set forth requirements for permitting programs and specific emission standards and limitations to assure that geographic areas either remain in attainment or regain attainment status. Once a state's SIP is approved by EPA, it is published in the Code of Federal Regulations and becomes enforceable federal law. Section 113 of the Federal Clean Air Act, 42 U.S.C. § 7413; 40 C.F.R § 52.23.

30.     Certain Massachusetts air pollution regulations designed to achieve and maintain attainment with the NAAQS have been approved by EPA and incorporated into the Massachusetts SIP and are therefore enforceable under the Federal Clean Air Act. These regulations include provisions regulating emissions of dust.

31.     Any person may commence a civil enforcement action under the Federal Clean Air Act against any party "who is alleged to have violated … or to be in violation of [] an emission

standard or limitation." Section 304 of the Federal Clean Air Act, 42 U.S.C. § 7604(a). An

"emission standard or limitation" is, among other things, any standard or limitation under any

approved State Implementation Plan. *Id.*, § 7604(f)(4).

32.     The Commonwealth is entitled to bring suit under Section 304 of the Federal Clean

Air Act because it is a "person" as defined by Section 302(e), 42 U.S.C. § 7602(e).

33.     This Court has authority to enjoin Defendants' violations of the Federal Clean Air

Act, and to impose penalties of up to $117,468 per day for each violation of the Federal Clean Air

Act pursuant to Sections 113(b) and 304(a), 42 U.S.C. §§ 7413(b), 7604(a). *See also* 40 CFR

§ 19.4, and 88 Fed. Reg. 989 (Jan. 6, 2023).

## State Environmental Requirements

*Massachusetts Air Act*

34.     The Massachusetts Air Act is intended to protect the atmosphere from pollution and

contamination. *See* G.L. c. 111, §§ 142A-142O.

35.     Pursuant to G.L. c. 111, § 142A, MassDEP has promulgated regulations that are

designed to prevent pollution or contamination of the atmosphere.

36.     Pursuant to its authority under the Massachusetts Air Act, MassDEP adopted air

pollution control regulations at 310 C.M.R §§ 7.00 – 7.76 ("Massachusetts Air Regulations") "to

prevent the occurrence of conditions of air pollution where such do not exist and to facilitate the

abatement of conditions of air pollution where and when such occur." These regulations are

designed to attain, preserve, and conserve the highest possible quality of the ambient air

compatible with needs of society." 310 C.M.R. § 7.00 (preamble).

37.     The Massachusetts Air Regulations provide that "[n]o person having control of any

dust … generating operations …" shall permit emissions therefrom which cause or contribute to a

condition of air pollution. 310 C.M.R. § 7.09(1). They also provide that "[n]o person shall cause, suffer, allow, or permit the handling, transportation, or storage of any material in a manner that results or may result in emissions therefrom which cause or contribute to a condition of air pollution." 310 C.M.R. § 7.09(4). The Massachusetts Air Regulations at 310 C.M.R. § 7.01(1) state: "No person owning, leasing, or controlling the operation of any air contamination source shall willfully, negligently, or through failure to provide necessary equipment or to take necessary precautions, permit any emission from said air contamination source or sources of such quantities of air contaminants which will cause, by themselves or in conjunction with other air contaminants, a condition of air pollution."

38.    "Air pollution" is defined by the Massachusetts Air Regulations to mean "the presence in the ambient air space of one or more air contaminants or combinations thereof in such concentrations and of such duration as to (a) cause a nuisance; (b) be injurious, or be on the basis of current information, potentially injurious to human or animal life, to vegetation, or to property; or (c) unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00.

39.    The Massachusetts Air Regulations provide that "No person owning, leasing or controlling a source of sound shall willfully, negligently, or through failure to provide necessary equipment, service or maintenance or to take necessary precautions cause, suffer, allow, or permit unnecessary emissions from said source of sound that may cause noise." 310 C.M.R. § 7.10(1).

40.    General Laws c. 111, §§ 142A and 142B state that a person who violates the Massachusetts Air Act or the Massachusetts Air Regulations is liable for civil penalties of up to $25,000 per day per violation and authorize this Court to enjoin further violations.

41.     The Attorney General has authority to enforce the Massachusetts Air Act and the Massachusetts Air Regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

## STATEMENT OF FACTS

### Description of the Defendants

42.     Defendant Brayton Point LLC, an affiliate of developer Commercial Development Company, Inc., purchased the entirety of the Brayton Point property in December 2018.

43.     Defendant Patriot is a Massachusetts corporation that performs stevedoring services at the Facility. Stevedoring is the process of loading or offloading cargo to and from a ship.

44.     Defendant EMR recycles 10 million tons of material annually and operates at least 40 scrap metal facilities across 11 states in the United States and more than 130 facilities globally. EMR has a United States headquarters in New Jersey and global headquarters in Warrington, United Kingdom.

### Description of the Facility

45.     Defendants EMR and Patriot together operated a scrap metal transportation operation on approximately 9 acres on a peninsula in Mount Hope Bay. The property was leased to the companies by Defendant Brayton Point LLC. The operation began in August of 2019 and terminated on March 21, 2022.

46.     During the time the scrap yard was operating, Defendants stored, moved, and transported ferrous and non-ferrous scrap metal at the Facility. The scrap metal consisted of large and small pieces ("Scrap Metal Materials"), and included small particles, or dust.

47.     Defendant EMR transported and delivered approximately 50 truckloads of Scrap Metal Materials to the Facility per day while the Facility was in operation.

48.     Scrap Metal Materials were stockpiled at the Facility and stored outside in large, uncovered piles.

49.     EMR dropped truckloads of Scrap Metal Material onto the ground at the Facility. Patriot picked up and moved Scrap Metal Materials around the Facility and dropped them onto the ground and into piles using trucks and other heavy equipment ("Heavy Equipment").

50.     Defendant Patriot moved the Scrap Metal Materials around the Facility and loaded it onto ships using Heavy Equipment.

51.     The loading of each ship took between four and five days. While the ship was docked at the Facility, loading took place 24 hours a day. During loading, Scrap Metal Materials were picked up and dropped into metal containers and equipment, creating additional dust emissions and loud noises.

52.     Defendants and persons that visited the Facility in the ordinary course of business scattered Scrap Metal Materials around the Facility, including on its ground surface.

53.     When Scrap Metal Materials were moved to, around, and from the Facility by trucks and Heavy Equipment, the materials were dropped onto the ground and some of the Scrap Metal Materials mixed with other materials on the ground.

### Defendants' Clean Water Act Violations

*Description of Stormwater at the Facility*

54.     During every rain or snowmelt event, runoff from the rain or snowmelt ("stormwater") flows over the ground surface at the Facility where Scrap Metal Materials and equipment were previously located and picks up pollutants, including heavy metals, from the Facility.

55.     Much of the polluted stormwater at the Facility flows to a basin at the southwest corner of the Facility. Defendants pump stormwater from this basin into Mount Hope Bay.

56.     During significant storm events, stormwater accumulates at the north end of the Facility and passes through a pervious barrier directly into Mount Hope Bay. The following image annotated by the Attorney General's Office shows the direction of flow of polluted industrial stormwater through the pervious barrier at this location.



57.     Dust from the Facility is also picked up by the wind and discharged to Mount Hope Bay.

*Potential Impacts from Pollutants in Stormwater Discharges from the Facility*

58.     The Facility's stormwater discharges likely contain a myriad of pollutants including lead, zinc, aluminum, iron, copper, organic matter (as indicated by measurements of chemical oxygen demand or COD), and suspended solids (as indicated by measurements of total suspended solids or TSS).

59.     Excessive heavy metals in runoff pose a threat to aquatic ecosystems, the food chain, and human health. Once introduced into the aquatic environment, lead and other heavy metals such as zinc, aluminum, iron, and copper will mix in the water column, settle into sediments, or be consumed by biota. Heavy metals are readily dissolved in water, making them easily absorbed by aquatic organisms such as fish and invertebrates. Lead is particularly toxic to organisms even at very low concentrations. Excessive levels of heavy metals in the aquatic environment can disturb organisms' growth, metabolism, and reproduction. The presence of heavy metals in bottom-sediment is an ongoing source of aquatic contamination because the metals will be slowly released into the environment over time and will become re-mobilized in times of flooding or other disruptive events. Heavy metals tend to bioaccumulate, posing a threat to species higher up on the food chain, such as humans.

60.     COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing other aquatic organisms or, in severe cases, asphyxiating them.

61.     TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Solids in scrap yard stormwater discharges are likely to include non-dissolved metal particles and contaminated soil. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe.

15

Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend.

62.     Mount Hope Bay is a state-listed impaired tidal estuary located at the mouth of the Taunton River on the Massachusetts and Rhode Island border. Mount Hope Bay has played an important role in the history of the area, from pre-colonial times to the present. While many years of sewage and industrial pollution have severely degraded the quality of the shallow waters of the bay, major efforts to clean it up and restore it have been implemented and are under way. The Commonwealth has designated the portion of the Taunton River that is tidally connected the Mount Hope Bay to be "Core Habitat" critical to the long-term persistence of over a dozen species, including the state and federally endangered Atlantic Sturgeon.

*Defendants' Inadequate Implementation of EPA's Stormwater Requirements*

63.     On or around May 12, 2020, EMR submitted a Notice of Intent ("NOI") to EPA to be covered by the Stormwater Permit. Patriot submitted a separate NOI to EPA on or around October 30, 2019. These NOIs identified one outfall located in the vicinity of the pond on the south side of the Facility ("Designated Outfall"). These NOIs failed to identify all stormwater outfalls at the Facility. For example, neither NOI identified the location at the north end of the Facility where stormwater passes through a pervious barrier during heavy rain events.

64.     Patriot prepared a separate SWPPP in April 2020 (the "Patriot SWPPP"). EMR prepared a SWPPP for the Facility in November 2020 (the "EMR SWPPP").

65.     EMR and Patriot did not identify the location of all stormwater discharge points in their respective SWPPPs. Neither the EMR nor Patriot SWPPP identified or described the way stormwater is discharged from the pond at the southwest corner of the Facility or identified or

described the location at the north end of the Facility where stormwater passes through a pervious barrier during heavy rain events as an outfall.

66.      Neither the EMR nor Patriot SWPPP identified the location of all stormwater conveyances. Neither SWPPP identified or described the way stormwater is pumped around and off the Facility

67.      Neither the EMR nor Patriot SWPPP accurately described the boundaries of where industrial activity occurred at the Facility. Both SWPPPs omitted a description or depiction of industrial activities that occurred on the northeast side of the Facility. The following image annotated by the Attorney General's Office shows the area omitted from the descriptions of industrial activities occurring at the Facility.



68.      Neither the EMR nor Patriot SWPPP described or documented the locations where stormwater benchmark monitoring samples are collected at the Facility.

69.     Neither the EMR nor Patriot SWPPP described the procedures for collection of sampling.

70.     Neither the EMR nor Patriot SWPPP showed how Defendants minimized pollutants to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices. For example, neither SWPPP described any maintenance or cleaning of the pond at the southwest corner of the Facility, or the manner in which stormwater is discharged from the pond. There was reference in the EMR SWPPP to an "oil and water separator" in the vicinity of the pond, but the oil water separator was not depicted on the site plan and was not described elsewhere in either SWPPP.

71.     Neither the EMR nor Patriot SWPPP described how and why any chosen control measures were selected.

72.     Neither the EMR nor Patriot SWPPP described a schedule of maintenance and good housekeeping measures used to minimize pollutant discharges.

73.     Neither the EMR nor Patriot SWPPP adequately described the process by which Defendants evaluated whether there were any unauthorized non-stormwater discharges from the Facility.

74.     Defendants did not select, design, install, and implement pollutant control measures that reduce and/or eliminate pollutants to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice. Because Defendants did not adequately analyze pollutant sources or pollutants in stormwater from the Facility, they did not know what control measures were appropriate to minimize pollutant discharges.

75.     Defendants failed to minimize contact of stormwater runoff with industrial materials and equipment.

76.     Defendants did not keep clean all exposed areas that were potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with dumpsters, and keeping exposed areas free of waste, garbage, and floatable debris.

77.     Defendants did not minimize generation of dust and off-site tracking of Scrap Metal Materials in order to minimize pollutant discharges.

78.     Defendants failed to monitor and control stormwater discharged during significant storm events from the northeast portion of the Facility.

79.     Defendants failed to monitor from the Designated Outfall during the third Quarter of 2020 and reported that the Facility had no discharge during that quarter even though Defendants pumped some of the contents of the pond into Mount Hope Bay from the Designated Outfall on July 2, 2020.

80.     Defendants' monitoring reports to EPA for the first quarter of 2020 were incomplete. They failed to include measurements for copper, zinc, TSS, and COD.

81.     Defendants' stormwater mixed with dust suppression water sprayed on Scrap Metal Materials. Dust suppression water is not an authorized non-stormwater discharge that can be covered under the Stormwater Permit.

**Defendants' Discharges of Excessive Dust Emissions into the Atmosphere**

82.     Defendants' operations resulted in the emission of excessive amounts of dust – also known as PM – into the atmosphere in the vicinity of the Facility.

83.     Defendants caused these dust emissions by storing Scrap Metal Materials outside where the dust was mobilized by the wind, by moving Scrap Metal Materials around the Facility

by trucks and Heavy Equipment, by driving motor vehicles, trucks, and Heavy Equipment over the ground surface at the Facility, and by loading Scrap Metal Material into ships.

84.     Defendants occasionally sprayed dust suppression water at some locations at the Facility. Defendants' spraying of dust suppression water was inadequate to control excessive dust emissions from the Facility.

85.     On March 15, 2021, and April 22, 2021, Defendants caused excessive dust emissions to be released into the atmosphere in the vicinity of the Facility. Below are two photographs illustrating conditions at the Facility as they appeared from the east looking west on March 15, 2021 and April 22, 2021.

March 15, 2021:



April 22, 2021:



86.     Exposure to PM has been linked to a variety of health problems, including premature death in people with heart or lung disease, nonfatal heart attacks, irregular heartbeat, aggravated asthma, decreased lung function, and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing.

87.     Dust from Defendants' scrap metal recycling activities likely contained heavy metals including but not limited to zinc, aluminum, iron, copper, lead, cadmium, and chromium.

88.     PM emitted from the Facility became suspended in the air in and around the Facility, including in the ambient air within the Brayton Point Residential Neighborhood.

89.     Members of the Brayton Point Residential Neighborhood complained that dust from the Facility landed on their homes, windows, plants, cars, and other property.

90.     Members of the Brayton Point Residential Neighborhood complained that they experienced eye irritation, throat irritation, increased asthma, and additional need for medical care because of the dust emissions.

21

91.     As a result of the Defendants' activities, nearby residents, including people living in the Brayton Point Residential Neighborhood, were exposed to potential harms associated with inhalation of PM and heavy metals.

## Defendants' Emissions of Excessive Noise from the Facility

92.     Since it began operating in August 2019 until the scrap metal operations ceased on March 21, 2022, the Facility emitted loud noises that disrupted the peace and comfort of nearby residents and interfered with nearby residents' ability to enjoy their lives and properties, including their ability to sleep. Loud noises occured when Scrap Metal Materials were brought to the Facility by trucks, moved around the Facility by Heavy Equipment, and loaded onto ships with Heavy Equipment.

93.     Defendants emitted loud noises from the Facility all day every Monday through Friday from 7:30 a.m. to 5:30 p.m. When Defendants were loading a ship at the Facility, the noises continued 24-hours a day until the ship left. Loading took place on average every five weeks and continued for approximately 4 days.

94.     The noises consisted of loud and almost constant banging and scraping of metal against metal. The noises could sound like thunder when ships were being loaded. Noises carried over the water between surrounding neighborhoods and the Facility. These sounds were even more disruptive during the warm weather months, when residents would have liked to have their windows open.

95.     The loud noises emitted by Defendants caused nearby residents to change their plans, close their windows, and lose sleep. Children who live near the Facility complained that the lack of sleep and disruption caused by the noise and dust emissions interfered with their ability to perform well in school and otherwise enjoy their activities.

**FIRST CAUSE OF ACTION**
**Noncompliance with the Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

96.     The Commonwealth realleges and incorporates by reference the allegations
contained in the above paragraphs.

97.     Defendants are "persons" within the meaning of Section 502(5) of the Clean Water
Act, 33 U.S.C. § 1362(5).

98.     Mount Hope Bay is a "navigable water" within the meaning of Section 502(7) of
the Clean Water Act, 33 U.S.C. § 1362(7).

99.     Since at the latest August 1, 2019, Defendants have violated the Stormwater Permit
by failing to:

    a.     submit a "complete and accurate Notice of Intent" for the Facility that lists all
           stormwater outfalls by a unique 3-digit code and corresponding latitude and
           longitude coordinates (Stormwater Permit Appendix G; 2015 Stormwater
           Permit section 1.2.1; 2021 Stormwater Permit section 1.3);

    b.     prepare a Stormwater Pollution Prevention Plan ("SWPPP") for the Facility
           that includes, among other things:

        i.     an adequate site description that includes the locations of all
               stormwater outfalls, the locations of all stormwater conveyances, a site
               map with the boundaries of industrial activity at the Facility, a
               description of the nature of the industrial activities at the Facility, and
               the location of potential pollutant sources (2015 Stormwater Permit
               section 5.2.3; 2021 Stormwater Permit section 6.2.2);

ii.    a description of monitoring procedures including locations where samples are collected, procedures for collection, and parameters for sampling (2015 Stormwater Permit section 5.2.5.3; 2021 Stormwater Permit section 6.2.5.3);

iii.   a description of control measures to meet techology-based and water quality-based effluent limitations. (2015 Stormwater Permit section 5.2.4; 2021 Stormwater Permit section 6.2.4.);

iv.    a description of how and why the chosen control measures were selected (2015 Stormwater Permit section 5.2.4; 2021 Stormwater Permit section 6.2.4);

v.     a description of the schedule of maintenance and good housekeeping measures used to comply with effluent limits (2015 Stormwater Permit section 5.2.5.1; 2021 Stormwater Permit section 6.2.5.1); and

vi.    an evaluation of unauthorized non-stormwater discharges (2015 Stormwater Permit section 5.2.3.4; 2021 Stormwater Permit section 6.2.3);

c.   select, design, install, and implement pollutant control measures that reduce and/or eliminate pollutants to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice (Stormwater Permit section 2);

d.   minimize contact of stormwater runoff with industrial materials and equipment (Stormwater Permit section 8.N.3.1.2);

24

e.   keep clean all exposed areas that are potential sources of pollutants by storing

materials in appropriate containers, properly controlling runoff associated with

dumpsters, and keeping exposed areas free of waste, garbage and floatable

debris (Stormwater Permit section 2.1.2.2);

f.   minimize generation of dust and off-site tracking of industrial materials in

order to minimize pollutant discharges (Stormwater Permit section 2.1.2.10);

g.   monitor stormwater discharges from all outfalls for compliance with

benchmarks applicable to scrap metal recycling and water transportation

facilities (2015 Stormwater Permit sections 6.2.1, 8.N.6, and 8.Q.6; 2021

Stormwater Permit sections 4.2.2, 8.N.7, and 8.Q.7);

h.   report all benchmark monitoring data to EPA within mandatory deadlines

(2021 Stormwater Permit section 7.4; 2021 Stormwater Permit section 7.3);

and

i.   prevent or eliminate unpermitted discharges of non-stormwater from the

Facility (2015 Stormwater Permit section 1.1.4.1; 2021 Stormwater Permit

section 1.1.3.1).

100.   Each of Defendants' violations of each of the requirements of the Stormwater

Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for

each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33

U.S.C. §§ 1365(a)(1) and (f).

101.   These violations establish an ongoing pattern of failure to comply with the

Stormwater Permit's requirements.

**SECOND CAUSE OF ACTION**
**Violations of the Federal Clean Air Act:**
**SIP Violations - Causing or Contributing to a Condition of Air Pollution**
**Violations of Section 304(a) of the Federal Clean Air Act, 42 U.S.C. §§ 7604(a)**

102.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

103.    Defendants are "persons" within the meaning of Section 304(a)(1) of the Federal Clean Air Act, 42 U.S.C. § 7604(a)(1).

104.    The Commonwealth is a "person" within the meaning of Section 304(a) of the Federal Clean Air Act, 42 U.S.C. § 7604(a).

105.    Defendants are "persons" within the meaning of 310 C.M.R. §§ 7.00, 7.01(1), 7.09(1).

106.    The requirements of 310 C.M.R. §§ 7.01(1) and 7.09(1) are included in the Massachusetts SIP approved by EPA. *See* https://www.epa.gov/sips-ma/epa-approved-regulations-massachusetts-sip.

107.    The requirements of 31 C.M.R. §§ 7.01(1) and 7.09(1) are "emission standard[s] or limitation[s]" within the meaning of Section 304(a)(1) of the Federal Clean Air Act, 42 U.S.C. § 7604(a)(1). *See* Section 304(f)(4) of the Federal Clean Air Act, 42 U.S.C. § 7604(f)(4).

108.    The Facility is an "air contamination source" within the meaning of 310 C.M.R. § 7.00, as incorporated into the Massachusetts SIP.

109.    Defendants emitted "air contaminants" into the air, within the meaning of 310 C.M.R. § 7.00, as incorporated into the Massachusetts SIP.

110.    Defendants' dust emissions into the ambient air near the Facility, including into the ambient air in the Brayton Point Residential Neighborhood, caused or contributed to a condition

"potentially injurious to human or animal life" or that "unreasonably interfere[d] with the comfortable enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00 (definition of "Air Pollution"). Accordingly, Defendants violated 310 C.M.R. § 7.01(1), as incorporated in the Massachusetts SIP, which is an emission standard or limitation under the Federal Clean Air Act. *See* Sections 304(a)(1) and 304(f)(4) of the Federal Clean Air Act, 42 U.S.C. §§ 7604(a)(1), 7604(f)(4).

111.    By permitting air contaminants to be emitted from the Facility that will cause or contribute to a condition of air pollution, Defendants violated 310 C.M.R. § 7.09(1), as incorporated in the Massachusetts SIP, which is an emission standard or limitation under the Federal Clean Air Act. *See* Section 304(a)(1) and 304(f)(4) of the Federal Clean Air Act, 42 U.S.C. §§ 7604(a)(1), 7604(f)(4).

112.    By allowing the handling, transportation, or storage of any material in a manner that results or may result in emissions therefrom which cause or contribute to a condition of air pollution, Defendants violated 310 C.M.R. § 7.09(4), as incorporated in the Massachusetts SIP, which is an emission standard or limitation under the Federal Clean Air Act. *See* Sections 304(a)(1) and 304(f)(4) of the Federal Clean Air Act, 42 U.S.C. §§ 7604(a)(1), 7604(f)(4).

113.    Each of Defendants' violations of 310 C.M.R. §§ 7.01(1), 7.09(1), and 7.09(4) is a separate and distinct violation of an emission standard or limitation under the Federal Clean Air Act for each day on which the violation occurred and/or continued. *See* Section 304(a) of the Federal Clean Air Act, 42 U.S.C. § 7604(a).

27

### THIRD CAUSE OF ACTION
### Violations of the Massachusetts Air Act:
### Causing or Contributing to a Condition of Air Pollution
### G.L. c. 111, § 142A; 310 C.M.R. §§ 7.01; 7.09

114.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

115.    Defendants are "persons" within the meaning of 310 C.M.R. §§ 7.00, 7.01(1), 7.09(1).

116.    The Facility is an "air contamination source" within the meaning of 310 C.M.R. §§ 7.00, as incorporated into the Massachusetts SIP.

117.    By emitting dust into the ambient air near the Facility, including into ambient air in the Brayton Point Residential Neighborhood, Defendants caused or contributed to a condition "potentially injurious to human or animal life" or that will "unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00 (definition of "Air Pollution"). Accordingly, Defendants violated 310 C.M.R. § 7.01(1).

118.    By emitting dust from the Facility into the ambient air near the Facility, including into the ambient air in the Brayton Point Residential Neighborhood, Defendants caused or contributed to a condition "potentially injurious to human or animal life" or that will "unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business." 310 C.M.R. § 7.00 (definition of "Air Pollution"). Accordingly, Defendants have violated 310 C.M.R. § 7.09(1).

119.    By allowing the handling, transportation, or storage of any material in a manner that results or may result in emissions therefrom which cause or contribute to a condition of air pollution, Defendants violated 310 C.M.R. § 7.09(4).

28

120.    Each of Defendants' violations of the Massachusetts Air Act and sections 7.01(1), 7.09(1), and 7.09(4) of the Massachusetts Air Regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

**FOURTH CAUSE OF ACTION**
**Violations of the Massachusetts Air Act:**
**Causing or Permitting Unnecessary Emissions of Noise**
**G.L. c. 111, § 142A; 310 C.M.R. §§ 7.10**

121.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

122.    Between August 2019 and March 21, 2022, Defendants owned, leased, or controlled the Facility.

123.    Between August 2019 and March 21, 2022, the Facility was a source of sound within the meaning of 310 C.M.R. § 7.10(1).

124.    By allowing or permitting unnecessary emissions of sound from the Facility, Defendants violated the 310 C.M.R. § 7.10(1).

125.    Each of Defendants' violations of section 7.10(1) of the Massachusetts Air Regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

**RELIEF REQUESTED**

Wherefore, the Commonwealth respectfully requests that this Court grant the following relief:

1.    Enjoin Defendants from discharging polluted stormwater without complying with EPA's Industrial Stormwater Permit;

2.    Order Defendants to pay civil penalties of up to:

a. $64,618 per day for each violation of the Federal Clean Water Act pursuant to Sections 309(d) and 505(a) of the Federal Clean Water Act, *See* 33 U.S.C. §§ 1311(a); 1365(a); 1319(d); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676 (Jan. 6, 2023);

b. $117,468 per day for each violation of the Federal Clean Air Act pursuant to Sections 113(b) and 304(a) of the Federal Clean Air Act, 42 U.S.C. §§ 7413(b), 7604(a), 40 CFR § 19.4, and 87 Fed. Reg. 1676 (Jan. 6, 2023);

c. $25,000 for each day of each violation of the Massachusetts Air Act, G.L. c. 111, § 142A, to the Commonwealth.

3.      Order Defendants to take appropriate actions to restore the quality of waterways impaired by their activities;

4.      Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by Section 505(d) of the Federal Clean Water Act, 33 U.S.C. § 1365(d), and Section 304(d) of the Federal Clean Air Act, 42 U.S.C. § 7604(d); and

5.      Award any such other and further relief as this Court may deem appropriate.

Dated: April 18, 2023                    Respectfully submitted,


COMMONWEALTH OF MASSACHUSETTS

By its attorneys,
ANDREA JOY CAMPBELL
ATTORNEY GENERAL

_____
Nora J. Chorover (Bar No. 547352)
Emily Mitchell Field (Bar No. 703726)
Assistant Attorneys General
Environmental Protection Division
Office of the Attorney General One
Ashburton Place, 18th Floor Boston,
Massachusetts 02108 Tel: (617)
727-2200
Nora.chorover@mass.gov
Emily.field@mass.gov

# EXHIBIT 1



LEGEND

▨ STRUCTURE STILL REMAINING
—— FACILITY BOUNDARY
—··— PROPERTY LINE

DSN 003

DETENTION BASIN

(SHOULD BE PRINTED ON 11 X 17 INCHES)

**Brayton Point LLC**

| DRAWN BY: MN | REVISION NUMBER: | DATE OF REVISION: | BY: | DESCRIPTION: |
|---|---|---|---|---|
| APPROVED BY: EBS | #1 | NA | NA | NA |
| DATE: 1/26/2023 | #2 | NA | NA | NA |
| SCALE: 1" = 100' | #3 | NA | NA | NA |

**FACILITY PLAN**
BRAYTON POINT, LLC, PATRIOT STEVEDORING & LOGISTICS, LLC, AND EASTERN METALS RECYCLING-TERMINAL, LLC
SOMERSET, MASSACHUSETTS

| PROJECT NUMBER: NA | SHEET NUMBER: 1 OF 1 |
|---|---|
| DRAWING DATE: 01/26/2023 | FIGURE NUMBER: 1 |